24 C.C.P.A. (Patents)

## LEVY v. GOULD et al.

## LEVY v. GOULD.

## LEVY v. RICE.

Patent Appeals Nos. 3728–3730.

Court of Customs and Patent Appeals.

Feb. 8, 1937.

Paul Kolisch, of New York City (R. C. Hopgood, of New York City, of counsel), for appellant.

Herbert A. Huebner, of New York City, for appellee Gould.

Cox & Moore of Chicago, Ill. (Theodore A. Hostetler, of Washington, D. C., and Ballard Moore and Richard R. Trexler, both of Chicago, Ill., of counsel), for appellee Rice.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

BLAND, Associate Judge.

These three cases are appeals by Sol J. Levy (assignor by mesne assignments to the Federal Telegraph Company, which now owns his involved application), from decisions of the Board of Appeals of the United States Patent .Office in three interferences, the general subject-matter of all of which relates to automatic remote control radio receiving sets. Patent appeal No. 3728 involves interference 64,088, hereinafter designated as interference "A"; patent appeal No. 3729 involves interference 64,089, hereinafter designated as interference "B"; and patent appeal No. 3730 involves interference

64,090, hereinafter designated as interference "C."

As far as the testimony and exhibits are concerned, the records in all three interferences (which were declared on the same date, June 14, 1932) are alike. Leslie A. Gould and Percy F. Rice, the appellees, took no testimony; Levy, long after he had parted with his interest in his application, adduced evidence consisting of twenty-nine exhibits and his deposition and those of six other witnesses.

Interference A was declared between claims 69, 70, 72, and 43 of Levy's application for patent, serial No. 55,989, filed September 12, 1925, claims 23, 24, 30, and 39 of an application of Gould, serial No. 25,-253, filed April 23, 1925, and claims 72, 73, 74, and 75 of an application of Rice, serial No. 10,190, filed February 19, 1925. Count 4 is typical of the four counts of this interference and reads: "4. A remote control system for a radio receiver having tuning and volume adjustments comprising means to actuate the tuning and volume adjustments of said receiver from a point remotely situated from said receiver."

In interference A, Rice is the senior party, and Gould and Levy are junior parties. Gould, being junior to Rice and having taken no testimony, is restricted to his filing date on the issue of priority, and it is therefore conceded that he must yield in favor of Rice. Levy, in his preliminary statement, claimed conception and disclosure to others in 1920; that he first made drawings and a written description of the invention on or about June 8, 1922; and that he first embodied his invention in a full-sized machine which was completed and successfully operated prior to March 15, 1922.

The Examiner of Interferences analyzed the evidence, held that it was insufficient to sustain the burden of proving conception prior to the record date of the senior party Rice, and stated: "For all of the reasons heretofore set forth, it is held that Levy has not proved by satisfactory and sufficient corroborative evidence, that he conceived and/or reduced to practice the invention in issue prior to his filing date."

Upon appeal by the party Levy, the Board of Appeals affirmed the decision of the Examiner of Interferences that the evidence did not support a holding of conception prior to the filing date of Rice. Levy thereupon appealed to this court.

Interference B was declared between claims 67, 68, and 71 of Levy's said application 55,989, and claims 9, 10, and 25 of Gould's said application 25,253. Count 3 is typical of the three counts involved and reads: "3. In a radio receiving mechanism, a tuning device and an indicator to indicate with what stations the tuning device is tuned, an electric motor connected with said tuning device and indicator, a source of current for operating the motor and indicator, a portable device remote from the tuning device but connected thereto, by a cable, a switch in the portable device for starting and stopping the motor and operating the indicator and a volume control device also in the portable device to control the sound volume of the mechanism."

The Examiner of Interferences stated that the counts of interference B were more specific than those of interference A and held, for the reasons given in his decision in interference A, that the party "Levy had not proved, by satisfactory and sufficient corroborative evidence, that he conceived and/or reduced to practice the invention in issue prior to his filing date," and since that date was subsequent to the record date of the senior party, Gould, awarded priority of invention of the subject-matter to Gould. Levy thereupon appealed to the Board of Appeals, which affirmed the decision of the Examiner of Interferences for the same reasons. Thereupon, Levy appealed to this court.

Interference C was declared between claim 56 of Levy's said application 55,989 and claim 76 of Rice's said application 10,-190. The sole count in issue originated in the Levy application and was suggested to Rice for interference purposes. It reads: "In a distant control apparatus for radio receiving apparatus embodying a tuning device, a motor adjacent the receiving apparatus operatively connected to said tuning device to effect adjustment of the latter, a control element adjacent the receiving apparatus for throwing the motor into and out of operation, motive means adjacent the receiving apparatus for actuating said control element, means located at a point distant to said receiving apparatus for controlling the operation of said motive means, and means for controlling the volume of reproduction of said receiving apparatus from said distant point."

In interference C the Examiner of Interferences held, following his decision in interference A, that "Levy had not proved, by satisfactory and sufficient corroborative evidence that he conceived and/or reduced to practice the invention in issue prior to

his filing date." He further held that Levy's Exhibits 6 and 7 did not disclose: " * * * a control element adjacent the receiving apparatus for throwing the motor into and out of operation, motive means adjacent the receiving apparatus for actuating said control element * * *," as specified in the count of interference C, and awarded priority to Rice. · Upon appeal, the Board of Appeals affirmed the decision of the Examiner of Interferences awarding priority to Rice. Levy thereupon appealed to this court.

Sol J. Levy, appellant in the three cases involved, identified a number of documents made prior to his filing date and which were introduced in evidence along with the other. exhibits. As to all of them he testified that they were in the same condition at the time of taking the testimony as when he prepared them. Levy testified that the first of these drawings, Exhibits 1–A and 1–B, was made by himself on June 8, 1922, when he had a radio factory; that the name "Sam Bronstein" on these sketches was that of his partner in the radio store who had witnessed these sketches and that he had not seen Bronstein since 1923 and had not been able to locate him; that these sketches were prepared from apparatus which had been built; that the second sketch, identified as Exhibit 2–A and 2–B, was made on August 5, 1922, and that it contained, in his handwriting, the words "Model as per above layout and wiring hook-up on reverse side finished today and operated satisfactorily"; that this model operated successfully in tuning in stations and controlling volume; that Exhibit 3 was a drawing completed on April 1, 1923, and witnessed by Claire Kosloff (who later became his wife) and one Nathan Freeberg; that apparatus and circuits shown on Exhibit 3 were built into an actual controller for a radio set prior to the drawing being completed; that the drawing, Exhibit 4, was completed on April 1, 1923, and witnessed by the same parties; that it represented an apparatus which he had built in 1921 or the early part of 1922, but that he had discarded it as being too cumbersome and too expensive; that Exhibit 5 was a drawing signed by himself on March 8, 1925, and witnessed by the two last-above-named parties; that a model embodying the device of this sketch was actually built and installed in an automobile; that it was put aside but later used in 1925; that Exhibit 6 was completed by him and signed on August 2, 1923, and was notarized on August 3, 1923; that Exhibit 7 is a specification and description of the invention embodied in Ex-

hibit 6, and was completed on January 28, 1924, when he signed it and had it notarized by Freeberg; that Exhibit 8 was prepared and drawn by him and is a finished drawing of a circuit which he had devised some time previous; that it was signed on April 1, 1925.

Levy testified to a wide experience in the field of radio from about 1915. He testified that Exhibit 9 was a drawing completed on September 11, 1925, which was witnessed by his wife and notarized by Freeberg, and represented advanced commercial designs of his apparatus; that Exhibits 10 and 11 were photographs taken of him and his finished apparatus on February 6, 1924; that he had not been able to locate the photographer who took them; that the radio set shown in the photograph was substantially the same as the one he had built in 1923 as was likewise the case with the remote control unit.

Levy identified Exhibit 12 as a valise which contained a radio receiver chassis mounted on a flat board comprising two stages of radio frequency, a detector, and three stages of impedance coupled audio frequency. He testified that the receiver was originally built in 1922 and modified in 1923 and that the valise also contained other mechanism and apparatus which he used from time to time. Levy identified the various pieces of mechanism and apparatus in Exhibit 12 (designated as Exhibit 12A, Exhibit 12B, etc.), and connected them up with the sketches previously introduced in evidence. He testified that the last time he made any changes in Exhibit 12A was prior to the filing date of the application involved.

Levy testified to a continuous activity since 1922 to commercialize his invention. Among other things, he testified that in the latter part of 1922 he demonstrated his remote control to two individuals, mentioning one Herskovitz whom he unsuccessfully sought to help finance his invention; that he continued to try to interest manufacturers with whom he dealt in the radio business, such as Frank Andrea of the Fada Company, Mr. A. Atwater Kent, and numerous others; that he brought from time to time to his home various individuals such as Nathan W. Altman, Nathan Freeberg, and a few others whom he tried to interest in the possibilities of electrical remote control; that while every one was interested, most were skeptical as to the practicability of a single dial receiver and the market possibilities of remote control; that he went with the Wurlitzer Company in the latter part of

1923 and 1924 and "had considerable conferences and correspondence with" the officials of that company with respect to their interest in going into the manufacture of a radio receiver such as he had developed; that he then went with the Stewart-Warner Speedometer Corporation, who at that time entered the field of radio manufacture (1925), and he continued his efforts to interest the factory in Chicago in going into the manufacture of his remote control radio receiver. He offered in evidence an agreement between a William Kennedy, who according to Levy was then one of the officials of the General Electric Distributing Company and who was very much interested in his device and tried to help him to commercialize it. Levy testified that some time in the latter part of 1923 he demonstrated to one Mortimer Norden of the Wurlitzer Company his remote control device, and that the latter was satisfied that the device was practical. Levy further testified that he kept up his efforts at commercialization until he finally consummated a deal with a Mr. Leo Potter "of Thermiodyne" in 1926, who was to manufacture his device.

L. Stewart Gatter testified that he was the attorney who prepared the Levy application involved in the instant interferences; that he could not state accurately, exactly when he first saw Exhibits 1 to 11 prior to the time when he prepared the application; that he had met Levy two or three years prior to this application; that his further recollection was that these exhibits were individually left with him at various times; that the photographs, Exhibits 10 and 11, were in his possession as well as the model itself for some months at least before the application date; that these drawings were in the same condition as they were in when he first saw them; that Exhibit 12A was the same control handle as the original control handle containing the calibrated meter and volume control which he saw in operation with the set several months prior to the time of the application. On cross-examination he testified that he operated the model himself in his office and that he also successfully operated it in Levy's home; that he did not believe he saw the model or the specification drawings offered in evidence prior to a year before the filing date of the application.

Claire K. Levy testified that she was the wife of appellant and described in a general way her familiarity with what Levy was trying to do with a remote control unit in 1921 and the following years. She identi-fied Exhibits 10 and 11 as being pictures of Levy operating his remote control apparatus. On cross-examination she testified that she did not understand any of the mechanical details of the apparatus and knew nothing about the circuits, but that she used to work the remote control herself; that she couldn't understand very well about the drawings, but that she remembered the drawings to the little details and would notice if they were changed.

Peter Kardon testified that from 1920 to 1924 he was works manager of the Raymond Engineering Company, and a radio jobber when the testimony was taken; that Levy mentioned to him "a control of radio from a remote place"; that this was about 1920 or 1921; that in 1922 Levy showed him rough sketches and models. He described the principle of operation of the 1922 set; that Levy operated this set for him but that he didn't operate it himself, "but my experience in mechanical construction, design, helped me to visualize that there was no reason why it shouldn't work."

Nathan Freeberg testified that he was a public accountant and had known Levy about twenty years; that Levy was a client of his during 1920, 1921, and 1922; that he was familiar with work which Levy did on remote control for radio sets to the extent that he had seen models operated in the latter part of 1920, 1921, and 1922. He identified his signature on the various exhibits and stated that they had not been changed to his knowledge. As to the apparatus of Exhibits 10 and 11, he testified that: "I can't very well describe it, I simply saw it operated and it worked much to my surprise. It was a radio set that was operated from where Mr. Levy sat as shown in Exhibit 10 and this particular, I believe it is called, remote control, was operated by a push button to tune in the station. There were several buttons on this control which were station indicators. That's as far as I can remember." He testified that he himself operated the remote control apparatus. He identified Bronstein's signature on the drawings.

Nathan Altman testified that he was an electrical contractor; that he first met Levy in the fall of 1922; that at that time Levy told him he was working on a remote control apparatus and demonstrated it to him; that Levy "had a little motor operating back and forth by the pressure of a button or the turning of a knob, and then he also had a meter on a sort of a handle that looked like a lady's mirror"; that he had seen some of the drawings and the photographs; that he

fully understood how the remote control worked. When asked if Levy explained it to him or if he looked for himself, he replied: "I looked for myself."

Mortimer Norden testified that he was sales manager for Claude Neon Ripple Lights; that he first met Levy in the fall of 1923; that his business at that time was manufacturing electrical displays; that some time after he had met Levy in 1924 he heard of an invention of Levy that had to do with remote control for radio sets; that he went to Levy's home; that Levy showed him a device which had a dial on it and a knob for controlling the radio volume which was connected by a cable to a radio set "which as I can partially remember actuated a motor, which in turn operated the various dials on the set"; that he recognized Exhibits 10 and 11 and that he gave Levy the box containing the apparatus in those photographs; that he himself later in 1923 or early in 1924 operated the radio set by means of remote control; that he partly understood the details of what Levy showed him.

Levy also introduced certain exhibits tending to show that prior to his filing date he was advertising the fact that he had invented and arranged for the manufacture of a receiving set showing a remote control. Exhibit 13 is an advertisement in the "Radio Dealer Weekly Service for Advertisers" dated August 29, 1925. He also introduced letters dated in August and September, 1925, before his filing date, in which he was attempting to arrange for the marketing of an automatic remote control receiver. In some of the letters he stated that he had made application for a patent.

Both the Examiner of Interferences and the Board of Appeals held that Exhibits 1 to 5, inclusive, did not meet the counts of the issue of any of the interferences. They did, however, say that Exhibits 6 and 7 showed a system which contained all the elements of the counts in interferences A and B and held that if these exhibits were proven as to dates and original condition, they would support a claim of conception at least as early as the date of the "specification" (Exhibit 7). As before stated, both tribunals held, however, that there was no such proof as to date and original condition.

As to interference C, both tribunals held, as before stated, that Exhibits 6 and 7 did not satisfy the clause of the count involved which reads: "* * * a control element

adjacent the receiving apparatus for throwing the motor into and out of operation, motive means adjacent the receiving apparatus for actuating said control element * * *."

The Examiner of Interferences, after stating the testimony substantially as is above set out, stated that, "Conception of an invention can only be established by proof of disclosure to others or embodiment of the invention in some clearly perceptible form, such as drawings or model, with sufficient proof of identity in point of time," and cites Mergenthaler v. Scudder, 11 App.D.C. 264. We think this is a correct statement of the law. The Examiner of Interferences then held that the disclosure to be sufficient must be made to persons competent to understand and appreciate the alleged invention; that the mere disclosure of the object of an invention is not a disclosure of the invention; that the disclosure to be sufficient must so describe the invention as to enable one skilled in the art to practice the invention; and that the mere showing of a device and a drawing to witnesses who do not understand the invention cannot be considered a disclosure. He held that Exhibits 6 and 7 contained all the elements of the counts of interferences A and B, but that there was no sufficient disclosure to any one who understood the invention and no sufficient proof of identity of the exhibits found in the record.

The Board of Appeals took substantially the same position, holding as did the Examiner of Interferences, that Exhibits 6 and 7 embodied the subject-matter of the counts in interferences A and B, but not of interference C, but stated that:

"As pointed out by the Examiner of Interferences, the party Freeberg, who took appellant's oath with respect to these drawings, was not technically trained or inclined and while he doubtless may have understood the general nature and purpose of the disclosure, it is not clear that he was sufficiently familiar with the contents of the two documents to which his signatures were attached to competently testify as to their original condition. After the oath was taken, both the drawing and the description remained in the appellant's custody and both might have been materially changed without such change being manifest to the witness Freeberg. Under the state of facts involved, it does not seem that an oath adds in any way to the effectiveness of these exhibits as evidences of conception.

"It is well settled that conception cannot be established by the inventor's own testimony or by mere self-serving declarations of the inventor to others. Conception requires either an actual disclosure to persons fully capable of understanding the invention or some equivalent act, such as the making of a drawing completely disclosing the invention *and putting such drawing out of the inventor's control*. In the present case, the attesting witness was incapable of fully understanding the invention and the drawing remained in the inventor's control." [Italics ours]

We are not in agreement with the finding of the Board of Appeals as to the effect of the proof in the record bearing on priority of invention of the counts in interferences A and B. It must be remembered that all the parties are applicants and that no patent is involved. It seems to us that the tribunals have held that Levy must prove his case beyond a reasonable doubt. This, of course, is not required. The question here is, there being no proof in the record introduced by Gould or Rice, does the record afford substantial evidence corroborating the testimony and exhibits of Levy?

We must approach this question in the light of the fact that there is no question of originality here involved, and that there are no such conflicts in the testimony as would indicate perjury. On being asked at the hearing in this cause here if there was a single suspicious circumstance relating to Levy's testimony and exhibits shown in the record, counsel for either Rice or Gould stated that there was only one thing to which he could point, and that was Exhibit 10, which is the picture of Levy operating his device while sitting some distance away from the receiving set. It was stated that there seemed to be some suggestion of trick photography, since it was evident that there was a substituted white background behind the connecting cable. Levy explains this fact, we think, satisfactorily. Certainly there is nothing about this fact to warrant a holding that the exhibit should be rejected or that it casts any damaging reflection upon Levy's record as a whole.

We know of no law, and certainly none has been cited to us, which requires that if drawings are depended upon to show conception of an invention, such drawings must be put out of control of the interested party. The authenticity of the document as to time and subject-matter might be shown irrespective of any consideration of where the document had been kept. Where the interested party does not put such drawings out of his control, and where there is nothing which is corroborative of testimony relating to such drawings, and when there is no proof of identity as to the time and subject matter, of course producing such a drawing after an interference proceeding has started would not be convincing evidence of conception. The testimony as a whole, we think, corroborates and substantially supports the positive and unrefuted testimony of Levy to the effect that he made the drawings and demonstrated the operation of the device when he said he did. That they were witnessed by Freeberg is unquestioned, and also that they have not been changed. The drawings are permanent ink drawings which obviously would readily disclose erasures or additions. To reject the evidence adduced by appellant in this case, the testimony of practically every witness must be viewed with suspicion and held unbelievable. To arrive at this conclusion we must assume that there may have been fraud and deception practiced and that forgeries may have been committed. The record, as we see it, presents no such picture. It is true that fault can be found with and criticisms made of the testimony of each of the witnesses. For instance, Mrs. Levy was the wife of the inventor; Freeberg at one time worked for Levy, and so on; but the evidence as a whole, we think, when considered in its proper light, is substantially corroborative of Levy's testimony. The testimony of any one witness, if standing alone, might not be sufficient to carry the burden imposed upon the junior party, but we must look at the record as a whole.

It must be remembered that the counts in interferences A and B are so broad as to broadly cover automatic remote control for a radio receiving set. That Levy had such a device long before the filing date of either of the other parties seems clear. If he did not, it is hard to supply a motive for his acts which he has clearly proven. It must be remembered that when he was demonstrating his device and having pictures made of it and advertising it for sale and attempting to commercialize it, there was no interference in the offing. No motive is now apparent why he should have acted as he did unless for the purposes which he has assigned. If there were circumstances suspicious in character which were out of harmony with the conclusion that Levy had the invention of the counts of interferences A and B, on the dates claimed, a view dif-

ferent from that entertained here might be arrived at. We think the record as a whole not only establishes the identity of Exhibits 6 and 7 as to time and subject-matter, but that Levy's demonstrations and verbal disclosures were made to some of the witnesses who could and did understand the invention expressed in the counts of interferences A and B.

The main contention of the appellees here is to the effect that there is no corroborative proof of Levy's testimony that he had a conception of the invention before his filing date. It seems to us that the record not only shows a conception but a reduction to practice of the invention of the counts in interferences A and B before the filing dates of the senior parties, and the above-enumerated facts clearly indicate sufficient testing to meet the requirements of law. Any contention that the record shows evidence of abandonment by Levy is without merit. It is seldom that a record in a case of this character discloses as much continued activity towards the completion and commercializing of an invention as is here shown.

The issue as to the single count in interference C presents a closer question. The tribunals of the Patent Office have concurred in a finding that all the elements of the count are not satisfied by Exhibits 6 and 7. It is pointed out that the phrase, "a control element adjacent the receiving apparatus for throwing the motor into and out of operation, motive means adjacent the receiving apparatus for actuating said control element," is not supported by the exhibits. Levy contends that the member 22 in conjunction with the notched wheel 20 constitutes control apparatus in accordance with the terms quoted. The board said: "These elements constitute a positive brake for stopping the apparatus upon opening of the motor circuit and for releasing the apparatus upon closing the motor circuit, but it seems to us that they do not throw the motor into and out of operation." It has not been made clear to us that the tribunals below are in error in this position, and in view of the fact that the testimony of the witnesses to whom Levy's alleged disclosure was made is general and not sufficiently specific to the particular structure involved in the count, we do not feel justified in reversing the decision of the board as to its award of priority of invention to the party Rice in interference C. We are satisfied that none of the other Levy exhibits more nearly approach showing the elements of the count than do Exhibits 6 and 7.

The decisions of the Board of Appeals are reversed in interference A (patent appeal No. 3728), and interference B (patent appeal No. 3729), and priority of invention of the counts therein is awarded to the appellant Levy. The decision of the board in awarding priority to the party Rice in interference C (patent appeal No. 3730) is affirmed.

Appeal No. 3728 reversed.

Appeal No. 3729 reversed.

Appeal No. 3730 affirmed.